**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| YEVGENIYA KHATSKEVICH,<br><br>      Plaintiff,<br><br>          v.<br><br>ALLEN E. KAYE and LEN SHAPIRO,<br><br>      Defendants. | Case No. 23 -cv- 9160 (KPF)(S.D.N.Y.)<br><br>**FIRST AMENDED COMPLAINT**<br><br>**Jury Trial Demanded Pursuant to Fed.R. Civ.P. 38(b)** |

      YEVGENIYA KHATSKEVICH ("Khatskevich" or "Plaintiff"), by and through her counsel, The Law Office of John T. Brennan, respectfully submits her complaint against Len Shapiro ("Shapiro") and Allen E. Kaye ("Kaye" or, collectively with Shapiro, "Defendants").

**NATURE OF THIS ACTION**

      1.      This lawsuit states two claims for relief under 18 U.S.C. §§1589 and 1594. Defendants were knowing and willing participants in the labor trafficking of Plaintiff in that they did contribute to the falsification of and H1B visa application filed on behalf of Plaintiff by her then employer and, over a period of years, assisted third parties in facilitating a scheme and conspiracy designed at to facilitate the trafficking of Plaintiff's labor and the covering up of the same.  Defendants received financial and other benefits for their participation in this scheme, which caused Plaintiff injury and damages – including punitive damages – for which Defendants should be held to answer.

**PARTIES**

      2.      Khatskevich is a thirty-seven-year-old citizen of the United States and a resident of the State of New York.

3.      Kaye is a citizen of the United States and was, upon information and belief, a resident of the State of New Jersey at all relevant times referenced herein.  Upon information and belief, Kaye is an immigration lawyer, and is the owner of Allen E. Kaye, P.C., located at 225 Broadway, 3rd Floor, New York, New York 10007.

4.      Shapiro is a citizen of the United States and was, upon information and belief, a resident of the State of Florida at all relevant times referenced herein.  Upon information and belief, Sapiro is a consulting engineer and is the owner of Energy Resources, Inc., located at 1221 Cocoanut Road, Boca Raton, Florida 33432.

**NON-PARTY ACTORS**

5.      Adam H. Victor ("Victor") is a seventy-year-old resident of New York County.  Victor resides in, and conducts business out of, seven condominium units that he owns located at Manhattan Place Condominium at 630 1st Avenue, New York, New York 10016 ("the MPC offices").  Victor conducts his business through various LLC's, LLP's and corporations.

6.      Among the entities that Victor controls and uses to his own ends, including the trafficking of immigrants, are the following:

A.   TransGas Energy Systems LLC ("TGES") is a limited liability company organized in the State of New York. TGES operates out of the MPC offices.

B.   TransGas Development Systems LLC ("TGDS") is a limited liability company organized in the State of New York. TGDS operates out of the MPC offices.

C.   Gas Alternative Systems, Inc. ("GAS") is a corporation organized under the laws of the State of New York. GAS operates out of the MPC offices.

D.   Project Orange Associates LLC ("POA") is a limited liability company organized in the State of New York. POA operates out of the MPC offices.

E.   Gas Orange Development, Inc. ("GOD") is a corporation organized under the laws of the State of Delaware. GOD operates out of the MPC offices.

F.  Transnational Energy, LLC ("TNE") is a limited liability company organized in the State of New York. THE operates out of the MPC offices.

G.  Transnational Management Systems, LLC ("TNMS") is a limited liability company organized in the State of Delaware. TNMS operates out of the MPC offices.

H.  Transnational Management Systems II, LLC ("TNMSII") is a limited liability company organized in the State of Delaware. TNMSII operates out of the MPC offices.

I.  Adam Victor & Son Stable LLC ("AVSS") is, upon information and belief, a limited liability company organized in the State of New York. AVSS operates out of the MPC offices.

J.  Manhattan Place Condominium ("MPC") is a condominium organized in the State of New York. MPC operates out of offices located at 630 1st Avenue, New York, New York 10016.

Collectively, Victor, Shapiro, Kaye, TGES, TGDS, GAS, POA, GOD, TNE, TNMS, TNMS II, AVSS and MPC are referred to, throughout this complaint as the Victor Operation.  Victor controlled the operations of the entities comprising the Victor Operation.

7.    Shapiro and Kaye, at all times relevant to the claims stated in this complaint, were participants in the Victor Operation.

## JURISDICTION & VENUE

8.    This Court has subject matter jurisdiction over the human trafficking claims stated in this complaint pursuant to 28 U.S.C. §1331, in that it arises under the laws of the United States, and 18 U.S.C. §1595(a), in that this Court is an appropriate district court in which this claim should be brought.

9.    This Court has personal jurisdiction over Kaye in that, at all times relevant, he conducted business within New York County and within the Southern District of New York.

10.    This Court has personal jurisdiction over Shapiro in that, at all times relevant, he regularly transacted business within New York County and within the Southern District of New York, which business was related to the claims stated in this complaint.

3

11.     The claims stated in this complaint are properly lodged in the Southern District of New York pursuant to (i) 28 U.S.C. §1391(b)(1) in that the Southern District of New York is the judicial district in which each of the defendants reside; and (ii) 28 U.S.C. §1391(b)(2) in that the Southern District of New York is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

### FACTS COMMON TO ALL CLAIMS

12.     Shapiro and Kaye have worked within the Victor Operation for at least the past fifteen to twenty years.

13.     Over this period, the Victor Operation participated in several ventures and operations.  While one of them, POA, made substantial money for Victor and others, most did not and by 2011 or so, Victor was a rich man with nothing to do but spin out fanciful ideas for business ventures and focus on his perversions.

14.     The operational structure of the Victor Organization was fairly lean.

15.     Victor was in charge of it, using its various entities to further his personal ends.

16.     Shapiro was Victor's second-in-command.  While ostensibly working for several years pursuant to engineering consulting agreements with several of Victor's entities, he actually was the day-to-day manager of the Victor Operation.  As Victor testified in a 2019 deposition in a sexual harassment case brought against him in the Supreme Court for the State of New York, New York County:

Q.      All right.  At that time, March -- again February, March 2013, did you have a managerial team in place at your companies?

A.      Essentially it was me.  That's the manager.  And other than some clerical staff, I typically liked to subcontract out, and a lot of that was with Len Shapiro.

Q.      So you had subcontracted out the management of your companies to Len Shapiro?

A.      The day-to-day stuff.  I basically would be -- I like to call it that I come in at -- I'm at 50,000 feet, and Len comes in at 500 feet, and he just compliments me. He is a detail-oriented person, I'm an idea person.

17.      In his capacity as Victor's second-in-command, Shapiro was aware of all significant operations and actions taken by the Victor Operation.

18.      Part of the activities and operations of the Victor Operation since at least 2008 were activities aimed at "gaming" the immigration system of this country.  In this regard, Victor – with the knowledge and, upon information and belief, the assistance, of Shapiro and Kaye – used at least 3 bogus visa applications to employ a person he shook down for a portion of his salary, employ a person at a "no show" job and to employ people from whom he sought to extract sexual favors.

19.      Plaintiff first met Victor in or around the first week of November 2012.

20.      At the time, Plaintiff was working as a receptionist/masseuse at a spa in Manhattan.

21.      On or about October 29, 2012, Hurricane Sandy hit New York City to devastating effect.  One night in early November 2023, as he was gadding about midtown with his videographer in tow, Victor noticed the spa where Khatskevich happened to work was open.  He and the videographer decided it was an opportune time to get a massage.

22.      Khatskevich was the only masseuse available, so she gave Victor a massage.  In total, Khatskevich spent approximately 15-20 minutes with Victor, during which time, Victor exposed his genitals to her.

23.      He then offered her a job organizing his apartment, office and storage space.  This brief interaction began Victor's sexually oriented obsession with Khatskevich.  He

later weirdly reflected on how he viewed his role as "rescuing" her and compared her to the character Fantine in *Les Miserables*.

## VICTOR'S OBSESSION WITH KHATSKEVICH
## LEADS TO HIS TRAFFICKING HER

24.     Following that first meeting, Victor took somewhat extraordinary steps to find Khatskevich, returning to the spa about a week later, looking for her.  Finding the spa closed, he left his card with a worker at a pizza parlor on the same block, instructing that person to give it to Khatskevich.  Victor returned to the spa again in early December 2012 and, finding it open this time, he left his card with one of the workers there telling that person to pass it on to Khatskevich.

25.     In or around the middle of December 2012, Khatskevich contacted Victor and they arranged for her to interview for a job organizing his apartment, office and storage space.

26.     Shortly thereafter, Plaintiff started working for Victor and the Victor Operation.

27.     Initially, Victor instructed Plaintiff to organize the MPC offices.

28.     At the beginning of her employment, the Victor Operation paid Plaintiff $8.00 per hour.  Later, the terms of Plaintiff's employment changed: Victor required her to perform organizational and other duties as he assigned them to her.  In return, he agreed to pay her tuition for ESL classes and rent, and pay her one hundred dollars ($100.00) per week.

29.     The Victor Operation rarely paid her according to the terms of these agreements, often withholding different items of compensation in an effort to coerce her into more personal or even sexual contact with him.

30.     During this initial period of her employment by Defendants, Plaintiff began to notice some of Victor's odd behavior:

A.      For example, she discovered that Victor stored ammunition on the floor, on a table, and next to a desk near the kitchen, in close proximity to Plaintiff's work area, and next to the safe in which Victor kept his guns.

B.      One day, when she was cleaning out a drawer in a cabinet, Victor told her to be careful as that was the drawer where he stored his condoms.

C.      On other occasions, when Plaintiff was working at the MPC Office, if she had to go to the bathroom, Victor would lurk outside the bathroom, offering comments such as: "What are you doing in there?  Taking a shit?"

31.      In or around February or early March 2013, Plaintiff started to work as Victor's administrative assistant.  In this capacity, her duties became more onerous.

32.      Victor told her that she had to be on call 24/7 and that she would be required to act as his receptionist, secretary and all-purpose assistant.

33.      This required her to prepare him for, and accompany him to, meetings (including traveling out of state with Victor, sometimes accompanied only by the crew of one of Victor's private planes) in connection with the Defendants' various projects, including meetings with potential investors and governmental authorities.

34.      Throughout the early part of her employment by Victor and the Victor Entities, Victor regularly "dangled" the possibility of an H1-B visa to her and regularly threatened to refuse to apply for one and have her deported.

35.      This represented the commencement of the Victor Operation's conspiracy to subject Khatskevich to labor trafficking.

36.      In March 2013, the Victor Operation took the first step in furtherance of this conspiracy by having  GAS and TGDS apply for an H1-B visa, with Khatskevich as the beneficiary.

37.     Upon information and belief, in applying for, pursuing and obtaining the H1B visa, Victor was assisted by Kaye and Shapiro.

38.     Shapiro assisted Victor in generating and compiling the information needed to complete the application.

39.     Upon information and belief, Shapiro assisted in drafting the narrative portions of the application, including a letter signed by Victor to USCIS describing the job that Khatskevich supposedly would be doing, Victor's companies' and their need to employ her.

40.     The application for the H1-B visa contained numerous false statements and misrepresentations and these were known by Victor, Kaye and Shapiro to be false and misrepresentative of Plaintiff's situation and the facts surrounding the job that Victor decided to provide for her.

41.     For example, the application claimed that Khatskevich would work for one of his companies as an "organizational psychologist."

42.     In fact, none of Victor's companies needed the services of an "organizational psychologist," as Victor, in the H1B application, admitted that his companies had only five employees, no operations and virtually no revenue; Khatskevich had never worked as an "organizational psychologist"; and Khatskevich was not qualified to work as an "organizational psychologist."

43.     Victor, and upon information and belief, Kaye and Shapiro, knew that these statements in the application were false when they worked on the H1B application and when they were submitted to USCIS..

44.     The application stated that Victor's company would be paying Khatskevich $79,914.00 annually.

45.     In fact, Victor never had any intention of doing so.  Following Victor's filing of the application of the H1-B visa, he told Khatskevich that he would not be paying her the noted $79,914.00 annually and that, instead, he would pay her 60% of that amount, keeping the other 40% for himself.  He further explained that he had used this kickback system with at least one former employee, a man named Aaron Daley.  In fact, though Khatskevich worked for the Victor Operation following the issue of the H1-B visa, Victor never paid her in accord with the H1-B visa.

46.     Upon information and belief, Kaye and Shapiro knew that the statements in the application regarding the amounts that the Victor Operation would be paying Plaintiff were false when they worked on the H1B application and when they were submitted to USCIS.

47.     In support of his company's application for the H1-B visa naming Khatskevich as the beneficiary, the Victor Operation submitted a letter to USCIS.  The letter is rife with falsehoods, misrepresentations and self-serving nonsense.

48.     Upon information and belief, Shapiro drafted this letter and Kaye reviewed it prior to submitting it.

49.     For example, in the letter, the Victor Operation claimed that the sponsor of the visa, TGES, was "in the business of redeveloping base-load power generation plants in New York City."  Later, he  admitted, under oath, that none of the companies he owned had ever redeveloped any base-load power generation plant in New York City (or any other place).

50.     The Victor Operation also claimed in the letter that TGES was "currently developing the TransGas Energy Cogeneration Facility."  Again, he admitted, under oath, that the TransGas Energy Cogeneration Facility was never developed.

51.     The Victor Operation described the duties that Khatskevich was to perform

in false, grandiose and nonsensical terms:

> We wish to employ Ms. Khatskevich in the professional position of Organizational Psychologist.  In this professional position, Ms. Khatskevich will work with our managerial team to implement corporate communication procedures and mediation methods designed to address sensitivity issues and increase consumer awareness of our corporate goals.  More specifically, she will apply principles of psychology throughout our organizational structure to include:  administration, human resources, management and decision making activities.  Ms. Khatskevich will work with senior level management to assist in policy planning that takes into account the psychological factors involved in decision making, particularly in connection with multi-million dollar energy development projects.  She will further advise on psychological factors to be considered when dealing with government agencies and/or high-profile individuals.
>
> Ms. Khatskevich will apply her knowledge of psychological factors to study and advise on public reaction to our energy development programs and develop new programs designed to effectively promote consumer awareness of the benefits of our projects.  Ms.Khatskevich will also formulate and implement staff training programs, applying principles of learning and individual differences.

52.     This letter is rife with falsehoods, including, without limitation, the

following:

A.     Contrary to the statement in the letter, Victor had no "managerial team" to work with.  He ran his companies himself, assisted only by Shapiro, his long-time functionary.  The remainder of the five employees that Victor admitted to having in the H1-B application, were (again, by his own admission) clerical employees.

B.     Additionally, there was absolutely no need for Khatskevich to "implement corporate communication procedures" as most of the few employees that Victor's companies had worked within his office space at 630 First Avenue – if they needed to communicate with each other, they could simply talk to each other.  While Shapiro did not work in New York on a full time basis, he too was only a phone call away.

C.     Also, Victor's companies had absolutely no need for "mediation methods designed to address sensitivity issues and increase consumer awareness of [their] corporate goals."  As none of his companies were developing anything, there were no disputes (within the companies or with outsiders) to mediate.

D.      Further, with no on-going or up-coming project, there was no need to "address sensitivity issues" because no one had any sensitivity regarding Victor's non-existent projects.

E.      Moreover, with no Victor project in the offing, consumers had absolutely no concerns about anything TGES was doing.  Thus, there was no need to "increase consumer awareness of our corporate goals."

F.      As Victor completely controlled every aspect of his companies' non-operations, they had absolutely no need to "apply principles of psychology throughout [their] organizational structure to include:  administration, human resources, management and decision making activities."

G.      Additionally, his companies, lacking any project – in the electrical power generation industry or any other sector – had no need for assistance "in policy planning that takes into account the psychological factors involved in decision making, particularly in connection with multi-million dollar energy development projects."

H.      Likewise, without any development on the horizon or any operations, Victor's companies had no need for Khatskevich to "apply her knowledge of psychological factors to study and advise on public reaction to our energy development programs and develop new programs designed to effectively promote consumer awareness of the benefits of our projects."

I.      Finally, as Victor's companies essentially were inert with only minimal clerical staff, there was no need for Khatskevich to "formulate and implement staff training programs, applying principles of learning and individual differences."

53.      In preparing the letter to the USCIS, Kaye and Shapiro knew that the foregoing statements in the letter were false when they worked on the H1-B application and when they were submitted to USCIS.

54.      After the Victor Operation applied for an H1-B visa for Khatskevich, Victor regularly threatened to withdraw the application when he was displeased with her.

55.      Victor informed her of the fact that the visa had been approved (prior to actually receiving it) and then reverted to threatening her and withdrawing the visa when, again, his mood on her soured.

56.     By the time he assisted in preparing, filing and pursuing Plaintiff's materially false H1-B visa application, Kaye was no stranger to playing fast and loose with the immigration system.  From 2010-2013, he had collected illegal broker's commissions (in addition to his legal fees) from the investments made by clients seeking EB-5 visas (visas made available to foreign nationals willing to invest in job creating activities in the U.S.).  In 2015, he entered into a consent decree with the Securities & Exchange Commission admitting to these violations of the law and SEC regulations.

57.     At or about the time that Shapiro was working on the H1-B visa application in furtherance of the Victor Operation's designs, Victor himself was taking steps to provide him with long term financial benefits for his continued participation in the Victor Operation.

58.     In March 2013, Victor was paying Shapiro $5,000.00 per month from one or more of the companies that Victor wholly owned and controlled.

59.     Shapiro's work on the Khatskevich visa application was completed in March 2013.

60.     In April 2013, MPC, the condominium where Victor lived, had his offices and held the position of President of the Board of Managers, started paying Shapiro $7,500.00 per month (later raised to $10,000.00 per month) as a consultant.

61.     In other words, Victor moved Shapiro from the payroll(s) of the companies he wholly owned to that of MPC, where he secured Shapiro a consulting contract that paid him monthly, earning him hundreds of thousands of dollars through at least 2018.

62.     Victor also had Khatskevich work for MPC, in support of the condominium's efforts to recover from severe damage caused to it by Hurricane Sandy; she

devoted 50% or more of her working hours to serving MPC during the period that she worked for the Victor Operation.

63.     With respect to Shapiro's contract with MPC – a functioning part of the Victor Operation:

A.     One of Victor's fellow board members at MPC and the condominium's managing agent have both testified that Victor essentially foisted Shapiro on MPC.

B.     Victor negotiated, drafted and executed the consulting contract between Shapiro and MPC before he ever introduced Shapiro to the other member's board. That is, Victor had bound MPC to pay Shapiro $7,500.00 per month (later raised to $10,000.00 per month), for an indefinite length of time, without telling anyone at MPC.

64.     The Victor Operation's payments to Shapiro continued into 2018.

65.     Throughout the period she worked for the Victor Operation, Victor combined threats on Khatskevich's immigration status with physical assaults (including a serious sexual assault), lecherous physical intrusions on her, oppressive sexual commentary and stalking her.

66.     Intertwined with this oppressive behavior were Victor's repeated threats to withdraw the H1B application and have her deported.

67.     As an example of his behavior in this regard, Victor once told her:

Eve I got to tell you ummm I'm not gonna threaten you but I'm gonna tell you this. If your attitude doesn't change I'm gonna fire you. ***I'm gonna cancel your visa, and have you fucking deported all right, you wanna fuck with me don't fuck with me because you are not smart enough you don't have fucking balls***. ***I will destroy you and I have destroyed other people, so I'm holding up my hand in friendship but don't push it.  Because I will enjoy destroying you.***  Do you understand?  You behave yourself and you are friendly and respectful for me.  You don't have to like me but you will respect me. ***Or you will be out of this fucking country and you will never see back in.***  You once told me never to see another side of you.  You remember that?  Well I'm seeing that side of you, you're gonna see that other side of me pretty soon.  If you don't basically become friendly and

respectful.  ***One fucking phone call all it takes Eve and your life is over.***  And I'm not asking anything from you other than politeness.  You don't have to go to the meeting today if you don't wanna go.

Plaintiff is in possession of a recording of this threatening screed.  (Emphasis added.)

68.     A more complete recitation of Victor's threats, assaults, stalking, and general perversions directed towards Plaintiff are contained in the complaint she filed against him in the case styled *Khatskevich v. Victor, et al.,* Index No. 151658/2014 (Sup. Ct. N.Y. Co.)(Hagler, J.).  Plaintiff hereby incorporates by reference the factual allegations of her Verified Complaint in that action into this Complaint as if set forth fully at this point.

69.     The Victor Operation's conduct towards Plaintiff, as described above, allowed the Victor Operation to procure and provide Plaintiff's labor through means of force, threats of force, physical restraint, or threats of physical restraint to Plaintiff in violation of 18 U.S.C. §1589(a)(1).

70.     Victor's conduct towards Plaintiff, as described above, allowed the Victor Operation to procure and provide Plaintiff's labor through means of serious harm or threats of serious harm to Plaintiff in violation of 18 U.S.C. §1589(a)(2).

71.     Victor's conduct towards Plaintiff, as described above, allowed the Victor Operation to procure and provide Plaintiff's labor through means of the abuse or threatened abuse of law or legal process in violation of 18 U.S.C. §1589(a)(3).

72.     Victor's conduct towards Plaintiff, as described above, allowed the Victor Operation to procure and provide Plaintiff's labor through s scheme, plan, or pattern intended to cause the Khatskevich to believe that, if she did not perform such labor or services,

she or others would suffer serious harm or physical restraint in violation of 18 U.S.C.

§1589(a)(4).

73.     Shapiro and Kaye knowingly benefited, financially or by receiving things

of value, from their participation in the Victor Operation, a venture which engaged in the

providing or obtaining of labor or services by any means that violated 18 U.S.C. §1589(a),

thereby themselves violating 18 U.S.C. §1589(b).

74.     Starting with the preparation of the fraudulent Khatskevich H1-B visa

application in March 2013, the Victor Operation and all of its constituent participants, including

Kaye, Shapiro, Victor and MPC, engaged in a conspiracy, one of the aims of which was to

procure and provide Plaintiff's labor through means of force, threats of force, physical restraint,

or threats of physical restraint to Plaintiff in violation of 18 U.S.C. §1594(b).

75.     Starting with the preparation of the fraudulent Khatskevich H1-B visa

application in March 2013, the Victor Operation and all of its constituent participants, including

Kaye, Shapiro, Victor and MPC, engaged in a conspiracy, one of the aims of which was to

procure and provide Plaintiff's labor through means of serious harm or threats of serious harm

to Plaintiff in violation of 18 U.S.C. §1594(b).

76.     Starting with the preparation of the fraudulent Khatskevich H1-B visa

application in March 2013, the Victor Operation and all of its constituent participants, including

Kaye, Shapiro, Victor and MPC, engaged in a conspiracy, one of the aims of which was to

procure and provide Plaintiff's labor through means of the abuse or threatened abuse of law or

legal process in violation of 18 U.S.C. §1594(b).

77.     Starting with the preparation of the fraudulent Khatskevich H1-B visa

application in March 2013, the Victor Operation and all of its constituent participants, including

Kaye, Shapiro, Victor and MPC, engaged in a conspiracy, one of the aims of which was operate

and run a scheme, plan, or pattern intended to cause the Khatskevich to believe that, if she did not

perform labor or services, she or others would suffer serious harm or physical restraint in

violation of 18 U.S.C. §1594(b).

78.     Shapiro and Kaye were central participants in a conspiracy to violate 18

U.S.C. §1589(a) & (b), and thereby violated 18 U.S.C. §1594(b).  This conspiracy lasted into

2018 given that upon information and belief, Shapiro and Kaye continued to receive benefits, in

the form of money and/or things of value from the Victor Operation into 2018.

79.     On or about October 18, 2013, Khatskevich ceased working for the Victor

Operation.  In February 2014, Khatskevich sued Victor, the numerous of his companies and MPC

in the New York State Supreme Court for New York County, stating claims for, among other

things, sexual harassment.

80.     After that, Victor commenced a campaign to both cover up evidence

regarding his labor trafficking of Khatskevich and to retaliate against her for suing him.

81.     For example, shortly after he was served with the Verified Complaint in the

*Khatskevich* Litigation, in a recorded conversation with one of his employees, that took place on

February 28, 2014, Victor laid out his detailed plans in this regard.

82.     First, Victor stated that he would falsely and publicly imply that

Khatskevich was a prostitute in order to discredit her and hide his trafficking: "We know she

wasn't a prostitute, but this is gonna be war."

83.     Second, he claimed that he would "countersue" Khatskevich "for damage

to [his] reputation."  Victor explained that this would drive up my costs because "lawyers get a

percentage of what they collect, but a lawyer, if you're basically defending, demands money

upfront, you have to be paying, you understand what I'm saying."  Victor considered suing

Khatskevich because he wanted to intimidate her and prevent her from exposing his labor

trafficking violations and he wanted to retaliate against her for suing him.

84.     Third, Victor outlined an oddly intricate plan pursuant to which he would

sue Tyler Erdman ("Erdman"), another Victor employee with whom, at that point, Khatskevich

was in a personal relationship:

> [S]o now Tyler's parents are gonna say, "What the fuck are you doing, Tyler?
> You're making us give you money, you stand in exposure of basically getting a
> judgment against you that bankrupts you, because you have to declare personal
> bankruptcy, for a woman who was a prostitute."  We know she wasn't a prostitute,
> this is gonna be war. And so, I think that Tyler's parents are gonna cut him off,
> throw him out of the house where Eve is, and say, "Either get rid of the girl, or
> we're basically kicking you out of your uncle's apartment."  So, I think what's
> gonna happen, Tyler's gonna lose the apartment, unless he dumps Eve, unless he
> cuts off – because that's the only way we're gonna basically settle with Tyler.
> We're gonna basically say "we'll settle with you if you throw her out."  And so
> she's gonna be, so she's not gonna have any place to stay then.

Victor's rantings on this subject reveal his desire to intimidate Khatskevich, cover-up his labor

trafficking violations and retaliate against her.

85.     Fourth, Victor explained that his countersuits against Khatskevich and

Erdman would so increase the amount of work that her lawyers would have to do on those cases,

that they would eventually "drop her":  "So, at a certain point, the amount of work that the

lawyers are gonna have to do is gonna be two or three times the amount of work on a normal

case, so at a certain point the lawyers are gonna basically drop her."

86.     After laying out this detailed cover-up and retaliation scheme, Victor

began executing it, first by pursuing patently baseless litigation against Khatskevich, Erdman and

Toktassynova:

A.  In September 2014, he filed the case styled *Victor v. Khatskevich, et al.,* Index No.
    158981/2014 (Sup. Ct. N.Y. Co.)(Hagler, J.), asserting claims against Khatskevich
    for, among other things, unfair competition, conversion, breach of fiduciary duty

and replevin.  Little of Victor's complaint against Khatskevich survived her motion to dismiss; only some aspects of the replevin claims remain.

B.  In June 2015, Victor filed his answer in the case styled *Toktassynova v. Victor, et al.*, Index No. 162327/2014 (Sup. Ct. N.Y. Co.)(Hagler, J.), and, in that filing, he publicly accused Toktassynova and Khatskevich of being prostitutes and thieves. The Court granted Toktassynova's motion to strike those scandalous allegations from Victor's answer.

C.  In February 2019, he filed a defamation case against Khatskevich, in the District of Columbia, claiming that because of statements Khatskevich made in a letter to the judge who sentenced him on his felony plea a year earlier, I had cost him a $300 million imaginary deal to build a plant of some sort in Romania.  Victor's claims were dismissed after a bench trial in January 2023.

87.     In 2015, Victor started complaining to government officials in an attempt to get Khatskevich deported.  In doing so, he contacted at least one official at ICE, telling him falsely that Khatskevich had "caused a serious breach of national security."

88.     In June 2015, Victor contacted the District Attorney for New York County. He was pressing for the District Attorney to investigate and charge Khatskevich for having "stolen over 2,700 of [his] computer/server files," despite having been told previously by the District Attorney that she had committed no crime.  Victor's complaints to the New York District attorney were interlaced with repeated bogus charges that Khatskevich had committed breaches of national security in an effort to interest some authority in having her deported.

89.     On November 2, 2015 Victor was trying to interest the New York office of the FBI in prosecuting Khatskevich including by suggesting to it that she posed a threat to national security and should be deported.  In this regard, he sent an email to Mr. George Tsang of the FBI and offered to talk to the FBI.

90.     On December 8, 2015, after finding out that the New York *Post* was going to publish a story about the sexual harassment case Khatskevich had filed, Victor wrote to his employee Randy Harris seeking advice on his response to the New York *Post* article.  Victor and

18

Harris exchanged emails in which Victor noted that he was still seeking to have Khatskevich arrested and deported over his bogus claims that she had stolen computer files from him and her danger to national security.

91.     By January 14, 2016, Victor was back to trying to interest the FBI in prosecuting Khatskevich and having her deported, dispatching his attorney, Joshua Krakowsky, to contact George Tsang of the FBI in this regard.

92.     In late March 2015, Plaintiff applied for a T-Visa, explaining in the application that she was a victim of labor trafficking.

93.     Plaintiff's application for a T-Visa was granted on or about September 15, 2015.

94.     In granting her T-Visa, USCIS determined, pursuant to 8 C.F.R. §214.11(b)(1), that Plaintiff was a victim of a form of severe trafficking in persons.

95.     In August 20-27, 2018 Victor was deploying MPC's counsel, Sam Rosenthal of the Nelson, Mullins, Riley & Scarborough LLP, to handle the "criminal" aspects of Victor's campaign against Khatskevich which, upon information and belief, included seeking to have the NYPD, the New York County District Attorney, the FBI, the U.S. attorney for the Southern District of New York and/or federal immigration authorities, including without limitation, ICE and USCIS, to prosecute and/or deport Khatskevich.

96.     One of Victor's goals in undertaking these efforts to have Khatskevich prosecuted and/or deported were designed to intimidate and silence Khatskevich.

97.     One of Victor's goals in undertaking these efforts to have Khatskevich prosecuted and/or deported were designed to retaliate against Khatskevich.

98.     One of Victor's goals in undertaking these efforts to have Khatskevich prosecuted and/or deported were designed to obscure his illegal trafficking activities and obstruct any possible criminal or civil claims being brought against him for his labor trafficking of Khatskevich.

99.     Throughout Victor's efforts described in ¶¶68-85 above, he was in direct communication with Kaye and Shapiro and upon information and belief, they advised him on these efforts and assisted him in carrying them out.

100.    Victor's activities, as described above, constitute a continuing violation of 18 U.S.C. §1589 stretching from March 2013 through at least August 2018.

101.    Throughout that period, Kay and Shapiro were paid by Victor and/or entities that he controlled for, among other things, assisting him in carrying out his on-going scheme to violate 18 U.S.C. §1589.

**FIRST CLAIM**
**Violations of 18 U.S.C. §1589(b)**
**(Against Kaye and Shapiro)**

102.    Plaintiff realleges ¶¶1-88 of the Complaint as if set forth fully at this point.

103.    The Victor Operation, in exploiting Khatskevich's labor, engaged in labor trafficking in violation of 18 U.S.C. §1589(a) during the period March 2013 through at least August 2018.

104.    Kaye's and Shapiro's participation in assisting Victor from March 2013 through at least August 2018, constituted an on-going violation of 18 U.S.C. §1589(b) in that both Kaye and Shapiro knowingly benefited, financially or by receiving things of value, from

participation in the Victor Operation which was engaged in the providing or obtaining of labor or services by any of the means described in 18 U.S.C. §1589(a).

105.   Kaye and Shapiro took such financial benefits or things of value from Victor knowingly, or in reckless disregard of the fact that the Victor Operation, through its scheme, had engaged in the provision or obtaining of Khatskevich's labor or services through means violating 18 U.S.C. §1589(a).

106.   Kaye and Shapiro have violated 18 U.S.C. §1589(b).

107.   As a victim of violations of 18 U.S.C. §1589(a) and 18 U.S.C. §1589(b), Khatskevich is entitled to recover against Kaye and Shapiro as they  have knowingly benefited, or attempted or conspired to benefit, financially or by receiving anything of value from participation in Victor's venture, which they knew or should have known, engaged in an act in violation §1589(a) and 18 U.S.C. §1589(b).

## SECOND CLAIM
### Violations of 18 U.S.C. §1594(b)
### (Against Kaye and Shapiro)

108.   Plaintiff realleges ¶¶1-88 of the Complaint as if set forth fully at this point.

109.   The activities of Kaye and Shapiro were performed in concert with the Victor Operation and with each other.

110.   Kaye and Shapiro (along with Victor) conspired to violate 18 U.S.C. §1589.

111.   Kaye and Shapiro's conspiracy to violate 18 U.S.C. §1589 constitutes a violation of 18 U.S.C. §1594(b).

**WHEREFORE,** Plaintiff prays this Honorable Court to award her, against Kaye and Shapiro, jointly and severally, on her first and second claims,

21

       A.      Compensatory damages sufficient to remedy any injuries suffered by her due to Kaye and Shapiro's participation in Victor's illegal labor trafficking scheme, including, without limitation, out of pocket expenses, emotional distress and pain and suffering;

       B.      Exemplary and/or punitive damages sufficient to (i) deter Kaye and Shapiro and others from engaging in such activities in the future; and (ii) punish Kaye and Shapiro for engaging in such activities as outlined herein;

       C.      Disgorgement of all monies or things of Value paid by Victor to Kaye and Shapiro during the period of at least March 2013 to August 2018; and

       D.      For such other relief as the Court may deem just and proper.

Dated: Brooklyn, New York
       May 10, 2024

          */s/ John T. Brennan*

          The Law Office of John T. Brennan
          151 East 4th St., No. 1-A
          Brooklyn, New York 11218
          (347) 785-3005
          lawoffjtb@gmail.com
          *Counsel for Plaintiff*