UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YEVGENIYA KHATSKEVICH,

                          Plaintiff,

          -v.-

LEN SHAPIRO and ALLEN E. KAYE,

                          Defendants.

23 Civ. 9160 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

        Plaintiff Yevgeniya Khatskevich ("Plaintiff" or "Khatskevich") brings this

action against Defendants Len Shapiro ("Shapiro" or "Defendant") and Allen E.

Kaye ("Kaye," and together with Shapiro, "Defendants") alleging that

Defendants were knowing and willful participants in a labor-trafficking scheme,

orchestrated by non-party Adam H. Victor ("Victor"), to employ Plaintiff against

her will by means proscribed by the Trafficking Victims Protection

Reauthorization Act (the "TVPRA").  Plaintiff brings claims pursuant to 18

U.S.C. § 1589(b), for Defendants' alleged participation in this scheme, and

pursuant to 18 U.S.C. § 1594(b), for Defendants' alleged conspiracy to violate

Section 1589.  Defendant Shapiro now moves, pursuant to Federal Rule of Civil

Procedure 12(b)(6), to dismiss Plaintiff's claims against him in their entirety.

For the reasons set forth in the remainder of this Opinion — in particular, the

early procedural stage of the litigation and the limited universe of documents

the Court can properly consider on a Rule 12(b)(6) motion — the Court denies

Defendant Shapiro's motion to dismiss.

**BACKGROUND**[1]

A.    **Factual Background**

1.    **The Parties**

Plaintiff is a thirty-seven-year-old resident of New York.  (AC ¶ 2).

Defendant Kaye, a resident of New Jersey, is an immigration lawyer and the

owner of Allen E. Kaye, P.C., which is located in New York, New York.  (*Id.* ¶ 3).

Defendant Shapiro, a resident of Florida, is a consulting engineer and the

owner of Energy Resources Group, Inc. ("ERG"), which is located in Boca

Raton, Florida.  (*Id.* ¶ 4).

Central to this action is non-party Adam H. Victor, who is a seventy-

year-old resident of New York.  (AC ¶ 5).  The Amended Complaint alleges that

Victor conducts business through various entities, and does so from seven

condominium units that he also owns and resides in, located at Manhattan

Place Condominium at 630 1st Avenue in Manhattan (the "MPC Offices").  (*Id.*).

Among the entities that Victor controls are at least seven limited liability

---

[1]    This Opinion draws its facts from the Amended Complaint ("AC" (Dkt. #25)), the well-pleaded allegations of which are taken as true for purposes of this Opinion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  The Court also relies, as appropriate, on certain of the exhibits attached to the Declaration of Steven Feigenbaum, filed in support of Shapiro's motion to dismiss the Amended Complaint ("Feigenbaum Decl., Ex. [ ]" (Dkt. #27)), and the exhibit attached to the Reply Declaration of Steven Feigenbaum ("Feigenbaum Reply Decl., Ex. [ ]" (Dkt. #32)).  The Court discusses which of these documents may be considered and for what purposes later in this Opinion.  *See infra* B.1; *see also DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).

For ease of reference, the Court refers to Shapiro's memorandum of law in support of his motion to dismiss as "Def. Br." (Dkt. #28); to Plaintiff's memorandum of law in opposition to Shapiro's motion as "Pl. Opp." (Dkt. #29); and to Shapiro's reply memorandum of law as "Def. Reply" (Dkt. #33).

companies and two corporations, which are referred to collectively in the Amended Complaint — along with Victor, Shapiro, and Kaye — as the "Victor Operation." (*Id.* ¶ 6). While the Amended Complaint provides details on each of these entities, the following entities are particularly relevant to the instant motion: (i) TransGas Energy Systems LLC ("TGES"), a limited liability company organized in New York; (ii) TransGas Development Systems LLC ("TGDS"), a limited liability company organized in New York; (iii) Gas Alternative Systems, Inc. ("GAS"), a corporation organized in New York; and (iv) Manhattan Place Condominium ("MPC"), a condominium organized in New York. (*Id.*). Each of these entities allegedly operates out of the MPC Offices, except for MPC itself, which operates out of other offices located in the same building. (*Id.*).

### 2. Defendants' Roles in the Victor Operation

Plaintiff alleges that Defendants Shapiro and Kaye have played key roles within the Victor Operation for at least the past fifteen to twenty years. (AC ¶ 12). During this time, the Victor Operation was allegedly thinly staffed, with Victor at the helm, using the Organization's various entities to further his own personal ends. (*Id.* ¶¶ 14-15). Shapiro functioned as Victor's "second-in-command." (*Id.* ¶ 16). While Shapiro was technically working as an engineering consultant for several of Victor's entities, in practice, Shapiro allegedly served as the day-to-day manager of the Victor Operation, with awareness of all significant operations and actions undertaken by the organization. (*Id.* ¶¶ 16-17).

3

This understanding of Shapiro's role within the Victor Operation derives, at least in part, from Victor's own deposition testimony in a related sexual harassment case (discussed below) brought in New York State Supreme Court, New York County. (AC ¶ 16). In that 2019 deposition, Victor stated that he "liked to subcontract out [his work], and a lot of that was with Len Shapiro." (*Id.*). Victor went on to state that while he is focused on the "50,000 feet" level of the Victor Operation, "Len [Shapiro] comes in at 500 feet" as the "detail-oriented person." (*Id.*). As relevant to the instant litigation, since 2008, Shapiro and Kaye allegedly supported the Victor Operation's efforts by participating in the preparation of at least three fraudulent visa applications. (*Id.* ¶ 18).

### 3. The Labor-Trafficking Allegations

Plaintiff met Victor in or around the first week of November 2012, while Plaintiff was working as a receptionist and masseuse at a spa. (AC ¶¶ 19-20). Plaintiff alleges that Victor's inappropriate conduct toward Plaintiff began during this first encounter, when Victor exposed his genitals during the massage. (*Id.* ¶ 22). Victor proceeded to offer Plaintiff a job organizing his home and office, which offer Plaintiff initially refused. (*Id.* ¶ 23).

In the weeks that followed, Victor allegedly went to great lengths to track Plaintiff down, which included returning to her place of employment on two separate occasions. (AC ¶ 24). In or around the middle of December 2012, Plaintiff contacted Victor and started working for the Victor Operation. (*Id.* ¶¶ 25-26). Plaintiff's work initially revolved around organizing the MPC Offices

for a wage of $8.00 per hour.  (*Id.* ¶¶ 27-28).  However, the terms of her employment soon changed, and Victor began paying Plaintiff at a rate of $100.00 per week, while also covering her rent and tuition costs for English as a Second Language ("ESL") classes.  (*Id.* ¶ 28).  While these were the supposed terms of Plaintiff's employment, Victor rarely adhered to them, and often withheld compensation to coerce Plaintiff into "more personal or even sexual contact with him."  (*Id.* ¶ 29).  In or around February or early March 2013, Plaintiff began working as Victor's administrative assistant.  (*Id.* ¶ 31).  Her duties were then more onerous than in her prior roles, requiring her to always be on call and to travel with Victor for various business meetings.  (*Id.* ¶¶ 31-33).

The Amended Complaint alleges that early in Plaintiff's employment, Victor would regularly mention the possibility of securing an H-1B visa for Plaintiff, while simultaneously using Plaintiff's immigration status to threaten her.  (AC ¶ 34).[2]  In March 2013, the Victor Operation took the first steps

---

[2]    *See generally United States ex rel. Billington* v. *HCL Techs. Ltd.*, 126 F.4th 799 (2d Cir. 2025):

> H-1B visas are intended to bring foreign workers to the United States to work when there are insufficient workers in the United States to perform a specific job.  The United States issues only a limited number of H-1B visas each year and awards them through a competitive lottery process.  An employer that employs a foreign worker on an H-1B visa is required by Department of Labor regulations to pay that employee a wage that is at least equal to the wage paid to American workers for the same work in the same geographical location.  *See* 20 C.F.R. § 655.731(a).  A petitioning employer must also submit an attestation with its H-1B visa application affirming that it will do so.

*Id.* at 802; *see also* https://www.dol.gov/agencies/whd/immigration/h1b (last accessed Mar. 14, 2025); https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations (last accessed Mar. 14, 2025).

towards securing Plaintiff's visa. (*Id.* ¶ 36). This was done by having two organizations within the Victor Operation, GAS and TGDS, apply for an H-1B visa on Plaintiff's behalf. (*Id.*). The Amended Complaint alleges that Kaye and Shapiro assisted Victor in preparing Plaintiff's visa materials. (*Id.* ¶ 37). For Shapiro's part, he allegedly generated and compiled information needed to complete the visa application, and assisted in drafting the narrative portions of the application. (*Id.* ¶¶ 38-39). Shapiro also allegedly assisted in drafting a letter signed by Victor and sent to U.S. Citizenship and Immigration Services ("USCIS"), which letter described the job that Plaintiff would supposedly be doing, Victor's companies, and their need to employ Plaintiff. (*Id.* ¶¶ 39, 48). Kaye reviewed the letter prior to its submission. (*Id.* ¶ 48).

According to Plaintiff, the letter sent to USCIS, along with the visa application as a whole, contained numerous false statements and misrepresentations, including that Plaintiff was going to work for the Victor organization as an "organizational psychologist." (AC ¶¶ 40-42). In describing Plaintiff's supposed role at TGES, the letter stated: "Ms. Khatskevich will work with senior level management to assist in policy planning that takes into account the psychological factors involved in decision making, particularly in connection with multi-million dollar energy development projects." (*Id.* ¶ 51). However, Plaintiff alleges that Victor had no managerial team to work with and no need for an organizational psychologist, as his team was comprised of himself and five clerical employees, and operated with the assistance of Shapiro. (*Id.* ¶ 52). What is more, Plaintiff did not have the qualifications to

work as an organizational psychologist. (*Id.*). The letter also mischaracterized the operations of TGES, by citing to projects that never existed and fictitious concerns about public opinion. (*Id.* ¶¶ 49-50, 52).[3] Victor, along with Shapiro and Kaye, allegedly knew that these statements were false, but nonetheless drafted the letter and submitted it to USCIS. (*Id.* ¶¶ 43, 47).

After the submission of Plaintiff's visa application, Victor allegedly used Plaintiff's pending application as a mechanism to threaten and exert control over her. For example, while the visa application stated that Plaintiff would be compensated at a rate of $79,914.00 per year, Victor later informed Plaintiff that he would not be paying her that amount. (AC ¶¶ 44-45). Instead, he would be keeping 40% of her salary for himself — an arrangement Victor had implemented before, with at least one former employee. (*Id.* ¶ 45). Victor would also regularly threaten to withdraw Plaintiff's visa application. (*Id.* ¶ 54). These threats culminated in "physical assaults (including a serious sexual assault), lecherous physical intrusions …, oppressive sexual commentary and stalking[.]" (*Id.* ¶¶ 65-67).

At or about the time that Shapiro was working on Plaintiff's H-1B visa application, Victor allegedly took steps to provide Shapiro with financial benefits for his continued participation in the Victor Operation. (AC ¶ 57). In March 2013, Victor paid Shapiro $5,000 per month from one or more of the

---

[3]    The Amended Complaint is unclear as to which companies actually sponsored Plaintiff's visa application. At times, Plaintiff states that GAS and TGDS applied for the visa, but other portions of the Amended Complaint state that TGES was the sponsor of the visa. (*Compare* AC ¶ 36 (discussing GAS and TGDS applying for the H-1B visa), *with id.* ¶ 49 (stating that TGES was the sponsor of the visa)).

companies that Victor wholly owned and controlled.  (*Id.* ¶ 58).  In April 2013,
MPC, the condominium in which Victor lived and held the position of President
of the Board of Managers, started paying Shapiro $7,500 per month (later
raised to $10,000 per month) as a consultant.  (*Id.* ¶ 60).  One of Victor's fellow
board members at MPC and the condominium's managing agent testified that
Victor foisted this contract on MPC, and that Victor personally drafted the
agreement.  (*Id.* ¶ 63).  Plaintiff alleges that Shapiro benefited from the
trafficking scheme through these fruitful contracts.  More broadly, both
Shapiro and Kaye are alleged to have continued to receive benefits from the
Victor Operation for their work (including their work on the scheme), "in the
form of money and/or things of value," into 2018.  (*Id.* ¶ 78).

### 4.    The State Court Litigation

Prior to bringing the instant action, Plaintiff sued Victor in state court for
his "threats, assaults, stalking, and general perversions directed towards" her.
(AC ¶ 68 (citing *Khatskevich* v. *Victor*, Index No. 151658/2014 (Sup. Ct. N.Y.
Co.) (Hagler, J.) (the "Victor Litigation")).  Plaintiff states that the allegations in
that suit are "incorporate[d] by reference" into the Amended Complaint.  (*Id.*).

To avoid liability in the Victor Litigation, Victor allegedly orchestrated a
plan to cover up his labor-trafficking scheme and to retaliate against Plaintiff,
including by falsely and publicly implying that Plaintiff was a prostitute.  (AC
¶¶ 80-85).  Victor's scheme included filing his own action against Plaintiff and
others in New York State court, asserting claims for unfair competition,
conversion, breach of fiduciary duty, and replevin.  (*Id.* ¶ 86 (citing *Victor* v.

*Khatskevich,* Index No. 158981/2014 (Sup. Ct. N.Y. Co.) (Hagler, J.)).  Victor

also filed a defamation case against Plaintiff in the District of Columbia.  (*Id.*).[4]

The defamation case, which was dismissed after a bench trial in January 2023,

asserted that statements made by Plaintiff in a letter to a judge sentencing

Victor after the latter's felony guilty plea, had cost Victor a $300 million

business opportunity.  (*Id.*).  For Shapiro and Kaye's part, they were allegedly

in touch with Victor as he formulated and carried out his plan to harm

Plaintiff's reputation and drive up her litigation costs.  (*Id.* ¶ 99 (stating that

Shapiro and Kaye "advised [Victor] on these efforts and assisted him in

carrying them out")).

       Victor also sought to retaliate against Plaintiff by contacting various state

and federal government officials, although the Amended Complaint does not

suggest that Defendants were involved in that outreach.  (*See* AC ¶ 99 (stating

that Kaye and Shapiro were involved in the efforts described in ¶¶ 68-85, which

do not include outreach to government officials)).  In June 2015, Victor

allegedly contacted the District Attorney for New York County, pressing the

District Attorney to investigate Plaintiff's alleged theft of thousands of computer

files.  (*Id.* ¶ 88).  Victor also claimed that Plaintiff had committed breaches of

national security and should be deported.  (*Id.*).  In November 2015 and

January 2016, Victor contacted the New York office of the Federal Bureau of

---

[4]     Although a citation to this case is not included in the Amended Complaint, Plaintiff
appears to be referring to *Victor* v. *Khatskevich,* Case No. 2019-CA-001264-B (D.C.
Super. Ct. 2019).

Investigation, and once again suggested that Plaintiff posed a threat to national security and should be deported. (*Id.* ¶¶ 89, 91).

## B.    Procedural Background

Plaintiff initiated this action with the filing of the Complaint on October 18, 2023. (Dkt. #1). Progress of the suit was delayed early on as Plaintiff addressed issues of service. (*See* Dkt. #15 (granting an extension to the service deadline)). On March 7, 2024, Defendant Shapiro submitted a letter, requesting a pre-motion conference on his anticipated motion to dismiss the Complaint in its entirety. (Dkt. #20).[5] Plaintiff opposed Shapiro's request to file a motion to dismiss. (Dkt. #21). On April 4, 2024, the Court held a pre-motion conference, during which the Court set a briefing schedule for the motion to dismiss, which schedule included a period for Plaintiff to file an amended complaint. (*See* April 4, 2024 Minute Entry).

Plaintiff filed her Amended Complaint, the operative pleading in this action, on May 28, 2024. (Dkt. #25). In accordance with the Court's briefing schedule, on June 14, 2024, Shapiro filed his motion to dismiss the Amended Complaint. (Dkt. #26-28). On July 22, 2024, Plaintiff filed her opposition to the motion to dismiss. (Dkt. #29). Finally, on August 12, 2024, Shapiro filed his reply in further support of his motion to dismiss. (Dkt. #32-33).

---

[5]    Defendant Kaye has not appeared in this action, despite being served on February 8, 2024. (*See* Dkt. #12).

**DISCUSSION**

**A.    Applicable Law**

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "draw all reasonable inferences in [p]laintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks omitted)).  A plaintiff is entitled to relief if she alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge plaintiff's claims across the line from conceivable to plausible." (internal quotations marks omitted) (citing *Twombly*, 550 U.S. at 570)).  That said, a court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (citation and internal quotation marks omitted); *see also Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678)).  Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

A court adjudicating a motion to dismiss under Rule 12(b)(6) "may review only a narrow universe of materials."  *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).  This narrow universe includes "facts stated on the face of the complaint" and "documents appended to the complaint or incorporated in the complaint by reference."  *Id.* (internal citation omitted); *accord United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).  "Where a district court considers material outside of the pleadings that is not attached to the complaint, incorporated by reference, or integral to the complaint, the district court, to decide the issues on the merits, must convert the motion into one for summary judgment."  *AECOM*, 19 F.4th at 106; *see also Friedl* v. *City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) ("'[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion,' a district court must either [i] 'exclude the additional material and decide the motion on the complaint alone' or [ii] 'convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material.'" (alterations added) (quoting *Fonte* v. *Bd. of Mgrs. of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988)).

**B.    Analysis**

The Court begins its discussion by addressing the threshold issue of what materials may properly be considered in deciding this motion.  The Court then turns to the merits of Shapiro's motion.  As explained in greater detail below, the Court finds that it may consider some, but not all, of Shapiro's extrinsic documents, and in many cases may do so only for certain limited purposes.  The Court next considers the merits of Shapiro's motion to dismiss, and ultimately denies the motion because the Court finds that Plaintiff has adequately pleaded claims under the TVPRA.

**1.    The Court May Consider Some, But Not All, of Shapiro's Extrinsic Evidence**

Shapiro's arguments for dismissal rely in substantial part on several exhibits that were attached to the declarations of Steven Feigenbaum in support of Shapiro's motion to dismiss.  (*See generally* Feigenbaum Decl.; Feigenbaum Reply Decl.).  These exhibits fall into the following four categories: (i) court documents from the Victor Litigation; (ii) documents related to Plaintiff's H-1B visa application process; (iii) the consulting agreement between ERG and MPC; and (iv) deposition testimony from the Victor Litigation. Shapiro urges the Court to consider these pieces of evidence because they are either "specifically referenced in the complaint, can be taken judicial notice of, or otherwise bear[] on allegations integral to the complaint."  (Def. Br. 8).  The Court examines each of Shapiro's documents in turn, and determines that some, but not all, of these documents can be considered.

### a.    Documents from the Victor Litigation

To begin, Shapiro argues that the Court should consider certain materials filed in the Victor Litigation.  (Def. Br. 9-10).  These include the original complaint in the Victor Litigation, filed on March 19, 2014 (Feigenbaum Decl., Ex. C), and the amended verified complaint, filed on September 1, 2016 (*id.*, Ex. D).  Shapiro asserts that these documents may be properly considered on this motion because they are incorporated by reference into the Amended Complaint.  (Def. Br. 15).  The Court agrees.

Plaintiff has explicitly stated that she incorporates by reference the allegations from her state court action into the Amended Complaint.  (*See* AC ¶ 68 ("A more complete recitation of Victor's threats, assaults, stalking, and general perversions directed toward Plaintiff are contained in the complaint she filed against him in the case styled *Khatskevich* v. *Victor, et al.*, Index No. 151658/2014 (Sup. Ct. N.Y. Co.) (Hagler, J.).  Plaintiff hereby incorporates by reference the factual allegations of her Verified Complaint in that action into this Complaint as if set forth fully at this point.")).  As caselaw in this Circuit has long held, a "complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."  *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (quoting *Cortec Indus., Inc.* v. *Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)).  Documents are incorporated by reference when, as here, the complaint makes a "clear, definite and substantial reference to the documents." *Lateral Recovery, LLC* v. *Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 436

(S.D.N.Y. 2022) (quoting *McKeefry* v. *Town of Bedford*, No. 18 Civ. 10386 (CS), 2019 WL 6498312, at *3 (S.D.N.Y. Dec. 2, 2019)).  In addition, because the state court complaints are incorporated by reference into the Amended Complaint, the Court can "consider the facts alleged" therein.  *DiFolco*, 622 F.3d at 111 ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider … documents incorporated by reference in the complaint.").

Shapiro goes on to argue that the Decision and Order entered on March 5, 2024, in the Victor Litigation (the "March 5, 2024 Decision" (Feigenbaum Decl., Ex. E)), whereby the state court granted summary judgment in favor of MPC, should also be considered by this Court.  (Def. Br. 9-10).  The March 5, 2024 Decision states, *inter alia*, that "MPC ha[d] met its burden establishing that Victor did not and was not permitted by the governing documents of MPC to operate MPC independently of all other Board members, and as such, could not exercise complete control over MPC thereby invoking liability against MPC."  (March 5, 2024 Decision 18).  Separately, the state court found "no evidence that MPC participated in any of the conduct plaintiff allege[d] against Victor or that MPC had knowledge of such conduct."  (*Id.*).  Shapiro urges this Court to consider that decision for two purposes.  *First,* Shapiro argues that principles of collateral estoppel bar Plaintiff from making the same arguments in this litigation.  (Def. Br. 10).  *Second*, Shapiro posits that the March 5, 2024 Decision "rebuts the inference" in the Amended Complaint that Victor "had Khatskevich work for MPC," and, by extension, that

Shapiro, as a consultant to MPC, benefitted in any way from Victor's alleged trafficking scheme.  (*Id.* (citing AC ¶ 62)).

Shapiro is correct that the Court can take judicial notice of the March 5, 2024 Decision (Def. Br. 15), even though Plaintiff did not incorporate the decision by reference.  However, the Court may do so for only one of the two purposes advanced by Shapiro.  "A court may take judicial notice of public records such as pleadings, orders, judgments, and other documents from prior litigation, including state court cases, but it does so not for the truth of the matters asserted in the other litigations, but rather to establish the fact of such litigation and related filings."  *Lynn* v. *McCormick*, No. 17 Civ. 1183 (CS), 2017 WL 6507112, at *3 (S.D.N.Y. Dec. 18, 2017) (internal quotation marks and citations omitted); *accord Glob. Network Commc'ns, Inc.* v. *City of New York,* 458 F.3d 150, 157 (2d Cir. 2006).  Accordingly, the Court will consider the decision in assessing Shapiro's arguments relating to collateral estoppel.  *See Holland* v. *JPMorgan Chase Bank N.A.*, No. 19 Civ. 233 (PAE), 2019 WL 4054834, at *3 (S.D.N.Y. Aug. 28, 2019) ("[I]t is proper to consider public documents on a motion to dismiss to determine whether claims are barred by prior litigation." (quoting *Cowan* v. *Codelia*, No. 98 Civ. 5548 (JGK), 2001 WL 856606, at *1 (S.D.N.Y. July 30, 2001))).  However, the Court cannot consider the March 5, 2024 Decision for its truth, and as such will not use the document to counter the allegations put forth in the Amended Complaint.  *See, e.g.*, *Roth* v. *Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("If the court takes judicial notice, it does so in order to determine *what* statements [the documents] contained —

16

but *again not for the truth of the matters asserted.*" (internal quotation marks omitted)); *McKenzie-Morris* v. *V.P. Recs. Retail Outlet, Inc.*, 638 F. Supp. 3d 333, 339-40 (S.D.N.Y. 2022) (refusing to use court documents from another case to find defendants' representations in the litigation inaccurate).

### b.    The Consulting Agreement

Next, Shapiro urges the Court to consider the April 1, 2013 consulting services agreement between his company ERG and MPC (the "Consulting Agreement"), which agreement is referenced, but not explicitly incorporated into, the Amended Complaint.  (Def. Br. 10-11).  Specifically, in explaining *Shapiro's* benefit from the labor-trafficking scheme, the Amended Complaint alleges that Victor "secured Shapiro a consulting contract" with MPC that "paid him monthly, earning him hundreds of thousands of dollars through at least 2018."  (AC ¶ 61).  This Consulting Agreement was supposedly "negotiated, drafted and executed" by Victor, who then "foisted" the Agreement on MPC's board.  (*Id.* ¶ 63).  The Amended Complaint implies that this lucrative contract was used to compensate Shapiro for his role in the scheme.  Shapiro counters that this narrative is false, in part because the Consulting Agreement was not signed by Victor, but rather by Shapiro and MPC's outside property manager.  (Def. Br. 11).  Moreover, according to Shapiro, the text of the Agreement evinces its legitimacy, because it is based on Shapiro's unique expertise in civil engineering and project administration, and was prompted by destruction caused by Hurricane Sandy.  (*Id.*).  Shapiro urges the Court to consider this agreement because it is "referenced in the [A]mended [C]omplaint" and "integral

17

to Plaintiff's allegation that Shapiro benefited from Victor's alleged trafficking scheme." (*Id.* at 16).

Shapiro is correct that the Court can consider this document. An extrinsic document can be considered on a motion to dismiss when "the complaint relies heavily upon its terms and effects, thereby rendering the document integral to the complaint." *DiFolco*, 622 F.3d at 111 (internal quotation marks omitted). For a document to be considered integral, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Id.* (quoting *Faulkner* v. *Beer*, 464 F.3d 130, 134 (2d Cir. 2006)). "In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason — usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim — was not attached to the complaint." *Glob. Network Commc'ns*, 458 F.3d at 157.

Here, the Consulting Agreement is referenced throughout the Amended Complaint. (*See* AC ¶¶ 61, 63). More significantly, the Agreement is fundamental to Plaintiff's claims, because Plaintiff must show that Shapiro received something of value in order to plead a claim against him under 18 U.S.C. § 1589(b). The document is also of the type that courts frequently view as integral to complaints, *see, e.g.*, *Madhu* v. *Socure Inc.*, 693 F. Supp. 3d 405, 418 (S.D.N.Y. 2023) (finding that a term sheet for a stock purchase could be considered on a motion to dismiss because the complaint "relie[d] heavily on its

18

terms and effects"); *Schinitsky* v. *Pac. Indem. Co.*, No. 22 Civ. 7509 (JPO), 2023 WL 6214880, at *2 (S.D.N.Y. Sept. 25, 2023) (considering an insurance policy on a motion to dismiss because it was integral to the complaint), and Plaintiff has presented no concerns regarding the authenticity of the document (*see generally* Pl. Opp.). Because the agreement is integral to the Amended Complaint, the Court will consider it in deciding this motion.

### c.    The Visa Application Materials

Shapiro also argues that the Court should consider various documents associated with Plaintiff's visa application. These documents include: (i) the H-1B application prepared for Plaintiff (the "Visa Application" (Feigenbaum Decl., Ex. G)); (ii) screenshots from the USCIS website (the "USCIS Screenshots" (*id.*, Ex. H)); (iii) the approval notice that USCIS provided on June 28, 2013 (the "Approval Notice" (*id.*, Ex. I)); and (iv) a letter dated March 28, 2013, that was submitted with the Visa Application (the "March 28, 2013 Letter" (*id.,* Ex. J)). Beginning with the Visa Application, Shapiro asserts that the Amended Complaint inaccurately describes the document because it states that Victor had "GAS and TGDS apply for an H[-1B] visa, with Khatskevich as the beneficiary," when, in actuality, the Visa Application only identifies TGES as a sponsor. (Def. Br. 11 (quoting AC ¶ 36)). This is confirmed by the USCIS Screenshots, which show that, in 2013, the only company in the Victor Operation that petitioned for a H-1B visa was TGES (*id.* at 12 n.4); and the Approval Notice, which lists TGES as the visa sponsor (*id.* at 12). The March 28, 2013 Letter, which is on TGES's letterhead and is signed by Victor,

is alleged to further support Shapiro's position. (*Id.* at 13). Finally, while the Visa Application lists Kaye and his law office as preparers of the application, Shapiro is mentioned nowhere. (*Id.* at 12).

Shapiro argues that the Court can consider these materials because "they are at the core of this case and integral to Plaintiff's claims against Shapiro and, except for Victor's letter, are official records of the U.S. government." (Def. Br. 16). The Court begins by finding that the Visa Application and the March 28, 2013 Letter are integral to the Amended Complaint, using the same analysis applied to the Consulting Agreement. The Visa Application is essential to Plaintiff's claims because it is fundamental to Plaintiff's explanation of how Shapiro contributed to Victor's labor-trafficking scheme. (*See* Pl. Opp. 4). The same is true for the March 28, 2013 Letter, which is cited at length, and at times reproduced verbatim, throughout the Amended Complaint as proof of Shapiro's involvement in Victor's scheme. (*See, e.g.*, AC ¶¶ 46-52). Because these documents are heavily relied upon by Plaintiff, who does not dispute the authenticity of either document, the Court views these documents as integral to the Amended Complaint.

The same cannot be said for the USCIS Screenshots or the Approval Notice, which are neither referenced nor relied upon in the Amended Complaint. (*See generally* AC). However, while the Court finds that neither the USCIS Screenshots nor the Approval Notice is integral to the Amended Complaint, the Court can take judicial notice of these documents. The Court takes judicial notice of the USCIS Screenshots because the authenticity of the

website is not in dispute, *see PK Music Performance, Inc.* v. *Timberlake*, No. 16
Civ. 1215 (VSB), 2018 WL 4759737, at *5 (S.D.N.Y. Sept. 30, 2018) (taking
judicial notice of screenshots from websites when neither party questioned
their authenticity), and courts routinely take judicial notice of public
information on official government websites, *see Rynasko* v. *N.Y. Univ.*, 63
F.4th 186, 191 n.4 (2d Cir. 2023) ("When considering a motion made pursuant
to Rule 12(b)(6)[,] we may take judicial notice of documents from official
government websites." (quotation marks omitted)).  Further, the Court can take
judicial notice of the Approval Notice because it was filed on the public docket
in the Victor Litigation.  *See Croci* v. *Town of Haverstraw*, 175 F. Supp. 3d 373,
381-82 (S.D.N.Y. Mar. 31, 2016) (discussing when a court can take judicial
notice of filings from other litigations).  As previously noted, however, the Court
is confined in the extent to which it can consider documents of which it takes
judicial notice, and these documents cannot be considered for the truth of the
matters asserted therein.  *See supra* B.1.a; *Glob. Network Commc'ns, Inc.*, 458
F.3d at 157.

### d.    Prior Deposition Testimony

Finally, Shapiro urges the Court to consider two depositions from the
Victor Litigation.  (*See* Feigenbaum Decl., Ex. K; Feigenbaum Reply Decl.,
Ex. L).  The first is Victor's 2019 deposition testimony (Def. Br. 13), which is
cited in the Amended Complaint as proof that Shapiro was "second-in-
command" and the "day-to-day manager" of the Victor operation (AC ¶ 16).  On
this point, Shapiro argues that the quotations in the Amended Complaint have

been cherrypicked, and that other portions of the deposition make clear that Shapiro was never a manager, officer, or employee at any of Victor's companies, but rather served exclusively as a subcontractor. (Def. Br. 13). The second is Plaintiff's own deposition testimony from the Victor Litigation. (Feigenbaum Reply Decl., Ex. L). Shapiro offers this deposition testimony to refute Plaintiff's contention that there are facts relevant to the H-1B visa application process that are within Shapiro's exclusive possession. (Def. Reply 1 n.1, 7). In particular, Shapiro argues that this testimony is not being proffered to "rebut an allegation in the complaint, but to show why the factual assumption underlying Plaintiff's 'exclusive knowledge' legal argument is false." (*Id.* at 8 n.5).

The Court finds that it would be improper to consider either deposition under Second Circuit precedent, which has sought to "deter[] trial courts from engaging in factfinding when ruling on a motion to dismiss." *AECOM*, 19 F.4th at 106 (quoting *Glob. Network Commc'ns*, 458 F.3d at 155). In particular, the Court is guided by *Goel* v. *Bunge, Ltd.*, where the Second Circuit found that a district court had improperly considered certain extrinsic sources, including the plaintiff's deposition testimony from a related New York state action, to be controlling. 820 F.3d at 560. There, the Court emphasized that a "complaint that alleges facts related to or gathered during a separate litigation does not open the door to consideration, on a motion to dismiss, of any and all documents filed in connection with that litigation." *Id.*

Working backwards, this Court clearly cannot consider Plaintiff's deposition testimony under the *Goel* framework.  (Feigenbaum Reply Decl., Ex. L).  There is simply no reference to Plaintiff's deposition in the Amended Complaint and no basis on which the testimony can be deemed integral.  *See Goel*, 820 F.3d at 554 (stating a deposition transcript may be considered when a complaint "so heavily rel[ies] on the terms and effect of [the] testimony that the deposition transcript may fairly be deemed integral to the complaint").  And while there may be a stronger argument for considering Victor's deposition testimony, because it is quoted in the Amended Complaint, such an argument ultimately fails.  "Merely mentioning a document" in a complaint, or "even offering limited quotation[s] from the document," will not satisfy the standard for deeming a document integral to a complaint.  *Id.* at 559 (internal quotation marks omitted).  That is especially applicable when, as here, only a small portion of the deposition testimony is quoted, and the testimony is not "a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls."  *Id.*; *see also Silverman* v. *Citibank, N.A.*, No. 22 Civ. 5211 (GHW), 2023 WL 7305243, at *6 (S.D.N.Y. Nov. 6, 2023) (declining to consider a deposition transcript from a bankruptcy case on a motion to dismiss when the complaint "reference[d] the deposition only in passing").

### 2.    Plaintiff Has Adequately Pleaded a Violation of the TVPRA

Having determined which documents may properly be considered on this motion, the Court now turns to the merits.  The Court begins its analysis by

23

addressing whether Plaintiff has plausibly stated claims under the TVPRA. After determining that she has, the Court then addresses whether Plaintiff's claims fall within the TVPRA's statute of limitations period.[6]  Viewing the facts in a light most favorable to Plaintiff, as it must do on a motion to dismiss, the Court ultimately concludes that Plaintiff has adequately pleaded timely claims.

### a.    Plaintiff Has Sufficiently Pleaded a Violation of 18 U.S.C. § 1589(b)

The relevant statutory history has been thoughtfully set out by a sister court in this District:

> Congress enacted the Trafficking Victims Protection Act of 2000 ("TVPA"), Pub. L. No. 106-386, 114 Stat. 1464, in response to the Supreme Court's decision in *United States* v. *Kozminski*, 487 U.S. 931 (1988), which narrowly defined "involuntary servitude" as "compulsion … through physical or legal coercion," *id.* at 952.  *See United States* v. *Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011).  The TVPA was designed "to reach cases in which persons are held in a condition of servitude through nonviolent coercion." 22 U.S.C. § 7101(b)(13).  Specifically, the TVPA added 18 U.S.C. § 1589 "to address the increasingly subtle methods of traffickers who place their victims in modern-day slavery, such as where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence" and [] "to combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in *Kozminski*."  H. R. Rep. No. 106-939, at 101, 2000 U.S.C.C.A.N. 1380, 1392-93 (2000) (Conf. Rep.); *see also Franco* v. *Diaz*, 51 F. Supp. 3d 235, 247 (E.D.N.Y. 2014) ("The [TVPA] does

---

[6]    *See generally Fullwood* v. *Wolfgang's Steakhouse, Inc.*, No. 13 Civ. 7174 (KPF), 2017 WL 5157466, at *6 (S.D.N.Y. Nov. 3, 2017) ("Timeliness is often an affirmative defense to be asserted in a responsive pleading, *see* Fed. R. Civ. P. 8(c)(1), and is, therefore, typically heard on a motion under Rule 12(b)(6)[.]" (collecting cases)).

not require that plaintiffs be kept under literal lock and
key.").

*Anora* v. *Oasis Pro. Mgmt. Grp., Ltd.*, No. 19 Civ. 11732 (LJL), 2023 WL
2307180, at *6 (S.D.N.Y. Mar. 1, 2023).  As enacted in 2000, the TVPA
specified only criminal penalties for traffickers.  "Congress later added a private
right of action in 2003, allowing plaintiffs to sue the immediate 'perpetrator' of
a human trafficking violation.  And then in 2008, Congress created the present
private right of action, allowing plaintiffs to sue defendants who are involved
indirectly with slavery."  *Nestlé USA, Inc.* v. *Doe*, 593 U.S. 628, 638 (2021) (first
citing Pub. L. 108-193 (Trafficking Victims Protection Reauthorization Act of
2003), § 4(a)(4)(A), 117 Stat. 2875, 2878, then citing Pub. L. 110-457 (William
Wilberforce Trafficking Victims Protection Reauthorization Act of 2008), §§ 221,
222(b)(3), 122 Stat. 5044, 5067-68); *see* 18 U.S.C. § 1595(a).

As potentially relevant here, Section 1589(b) of the TVPRA extends
liability to anyone who

> knowingly benefits, financially or by receiving anything
> of value from participation in a venture which has
> engaged in the providing or obtaining of labor or
> services by any of the means described in subsection
> (a), knowing or in reckless disregard of the fact that the
> venture has engaged in the providing or obtaining of
> labor or services by any of such means.

18 U.S.C. § 1589(b).  To plausibly state a claim under the financial beneficiary
prong of the TVPRA, a plaintiff must plead "three elements: [i] that the
defendant 'knowingly benefited or received anything of value' [ii] 'from
participation in a venture,' [iii] which [the beneficiary] knew or should have
known has engaged' in an act in violation of §§ 1581 or 1589."  *Cho* v. *Chu*, No.

21 Civ. 2297 (PGG) (SDA), 2022 WL 2532446, at *2 (S.D.N.Y. May 12, 2022) (quoting 18 U.S.C. § 1595(a)), *report and recommendation adopted*, No. 21 Civ. 2297 (PGG) (SDA), 2022 WL 4463823 (S.D.N.Y. Sept. 26, 2022). Shapiro challenges Plaintiff's ability to satisfy the first and second prongs of this standard. The Court disagrees, and addresses each of Shapiro's arguments in turn.

### i.    Knowing or Reckless Participation in the Venture

To begin, Plaintiff has adequately alleged that Shapiro knowingly or recklessly participated in the trafficking venture by assisting Victor in the preparation of Plaintiff's H-1B visa application. The Amended Complaint alleges that Shapiro acted as Victor's "second-in-command," such that he had awareness of all the operations of the Victor Operation. (AC ¶ 16). More significantly, Plaintiff alleges that Shapiro personally participated in the drafting of Plaintiff's fraudulent visa application, which was purportedly used by Victor to exert control over Plaintiff. Shapiro's assistance allegedly extended to "drafting the narrative portions of the application, including a letter signed by Victor to USCIS describing the job that Khatskevich supposedly would be doing, Victor's companies' and their need to employ her." (*Id.* ¶ 39). The Amended Complaint also includes various statements from the Visa Application and the March 28, 2013 Letter that are alleged to be false, and that Shapiro should have known to be false. (Pl. Opp. 4 (citing AC ¶¶ 40-53)). These factual allegations are sufficient at this stage to establish knowing or reckless participation in the venture.

Moreover, the specificity of these allegations makes this case readily distinguishable from those cited by Shapiro, where courts dismissed TVPRA claims under the knowing or reckless participation prong.  (Def. Br. 19-20).  For example, in *Noble* v. *Weinstein*, the court dismissed claims against one defendant because the plaintiff had merely pleaded "association" with a venture, and not "factual allegations of participation."  335 F. Supp. 3d 504, 524 (S.D.N.Y. Aug. 14, 2018) (describing how the complaint was missing "factual allegations that link [the defendant's] actions to [the unlawful] conduct toward [the plaintiff]").  That is not the case here, where Plaintiff alleges the actions that Shapiro took to partake in and further advance the scheme.

What is more, the Court rejects Shapiro's argument that Plaintiff has not pleaded with the requisite particularity the information in the visa application that Shapiro is alleged to have generated or compiled.  (Def. Br. 18).  At this time, it is enough that Plaintiff has alleged that Shapiro knew the inaccuracies of the visa application, assisted in drafting various potions of the application, and understood that Victor intended to use the application to coerce Plaintiff.  (*See, e.g.*, AC ¶¶ 36-53).  And there is no dispute that Victor's conduct, as alleged, could constitute a violation of 18 U.S.C. § 1589(a), such that liability can be imposed on knowing participants in a venture under Section 1589(b).  *See Adia* v. *Grandeur Mgmt., Inc.*, 933 F.3d 89, 93-94 (2d Cir. 2019) (finding a plausible allegations of trafficking under Section 1589(a)(4) when defendants engaged in a scheme "whose purpose was to make [plaintiff] rely on them in remaining in this country legally, to force him to accept less than the prevailing

27

wage rate based on the threat of facing deportation, and similarly to forestall any effort to seek other employment"); *Paguirigan* v. *Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 439 (E.D.N.Y. 2017) (denying a motion to dismiss a claim under Section 1589(b) when plaintiff had plausibly stated a violation of 18 U.S.C. § 1589(a)).

Finally, while the Court has held that it may consider the Visa Application and the March 28, 2013 Letter as integral to the Amended Complaint, the content of these documents does not change the Court's analysis. Shapiro correctly points out that the H-1B visa application identifies Kaye as counsel to TGES and as the preparer of the application. (Def. Br. 19). However, this fact does not dispositively prove that Shapiro was not *also* involved in the preparation of the visa materials. (*Id.* (citing Feigenbaum Decl., Ex. G)). Nor does the fact that Shapiro is not mentioned in the two complaints filed in the Victor litigation foreclose Plaintiff from alleging his involvement in her visa applications. (*Id.* (citing Feigenbaum Decl., Ex. C, D)). The Victor Litigation was filed in 2014, and was brought against different parties for different causes of action. (*See* Feigenbaum Decl., Ex. C, D).

### ii.    Knowingly Benefitting or Receiving Something of Value

Shapiro also argues that the Amended Complaint fails to adequately plead that Shapiro knowingly benefited from the trafficking venture. In doing so, Shapiro asserts that the Consulting Agreement between ERG and MPC had "nothing to do with Victor's alleged trafficking scheme." (Def. Br. 20). Instead, he maintains, the true purpose of the contract was to "provide advisory

services for work in connection with [MPC's] project for Manhattan Place Condominium's switchgear equipment replacement and relocation, lobby refurbishment and other related upgrades." (*Id.* at 21 (citing Feigenbaum Decl., Ex. F at 1)). Shapiro posits that MPC retained Shapiro because Shapiro had certain requisite "civil engineering skills and project-administrative expertise" — not because of Victor's influence. (*Id.*). Further, Shapiro argues that the Agreement's continuation into 2018 was a result of MPC's satisfaction with the quality of his work, as opposed to anything related to the trafficking scheme. (*Id.* at 21-22).

Despite these assertions, the Court once again finds that Plaintiff's allegations are sufficiently pleaded. The Amended Complaint alleges that Shapiro's work on the visa application ended in March 2013. (AC ¶ 59). A few days later, Shapiro secured a lucrative contract with MPC, which was allegedly operating under Victor's control. (*Id.* ¶ 60). These allegations allow the reasonable inference that Victor provided Shapiro with this beneficial contract because of Shapiro's support of the labor-trafficking scheme. *See Geiss* v. *Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019) (discussing how a claim can proceed if plaintiff establishes a "causal relationship between affirmative conduct furthering the [labor-trafficking] venture and receipt of a benefit, with actual or, in the civil context, constructive knowledge of that causal relationship").

Moreover, collateral estoppel does not bar this Court from a finding that the Consulting Agreement was related to the trafficking scheme. (Def. Br. 20).

In the briefing on his motion to dismiss, Shapiro argued that the March 5, 2024 Decision "constitute[d] a judicial determination, on a summary judgment motion … that MPC was always independent of Victor and any of his companies, outside Victor's control, and unaware of Victor's alleged wrongs to Khatskevich." (*Id.*).  However, on November 4, 2024, Shapiro submitted a supplemental letter to this Court, which provided an update on the Victor Litigation and Justice Hagler's most recent decision in the case.  (Dkt. #34).  In that opinion, issued on November 1, 2024, Justice Hagler reinstated the New York City Human Rights Law claim against MPC, finding that there was an "issue of fact as to whether Victor[] could be considered an agent of MPC such that his alleged acts of sexual assault against plaintiff would be imputed to MPC under the NYCHRL." (Dkt. #34-1 at 8).  Justice Hagler reasoned that "deposition testimony and affidavits reveal that Victor, as President of the Board of MPC[,] dominated MPC." (*Id.*).  In light of this decision, Shapiro can no longer argue that there has been a final determination on whether the Consulting Agreement was issued at Victor's behest.  *See Marvel Characters, Inc.* v. *Simon*, 310 F.3d 280, 288 (2d Cir. 2002) (explaining that issue preclusion "prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was *fully and fairly litigated* in a prior proceeding" (emphasis added)).  Accordingly, the Court denies Shapiro's motion to dismiss Plaintiff's claim under Section 1589.

### b. Plaintiff Has Sufficiently Pleaded a Violation of 18 U.S.C. § 1594(b)

For many of the same reasons already discussed, Plaintiff has also stated a conspiracy claim pursuant to 18 U.S.C. § 1594(b). For there to be a conspiracy under Section 1594(b), there must be an agreement to violate the prohibition on forced labor. *See Han* v. *InterExchange, Inc.*, No. 23 Civ. 7786 (JLR), 2024 WL 3990770, at *15 (S.D.N.Y. Aug. 28, 2024). Shapiro argues that Plaintiff has failed to cite "written or verbal communications among Shapiro, Kaye and Victor," which suggest that "Shapiro even knew Victor was supposedly engaging in a trafficking scheme." (Def. Br. 22-23). However, Plaintiff need not plead the existence of an explicit agreement to state a claim under Section 1594(b), but rather needs to "allege facts that plausibly show that the defendants 'entered into a joint enterprise with consciousness of its general nature and extent.'" *Paguirigan*, 286 F. Supp. 3d at 440 (quoting *Stein* v. *World-Wide Plumbing Supply Inc.*, 71 F. Supp. 3d 320, 330 (E.D.N.Y. 2014)). The Amended Complaint alleges that Defendants worked with Victor to create a fraudulent visa application, which was intended to allow Plaintiff to remain in the United States and work under Victor's control. Such allegations are sufficient to survive a motion to dismiss. *See Han*, 2024 WL 3990770, at *15-16; *Akhtar* v. *Vitamin Herbal Homeopathic Ctr. Inc.*, No. 19 Civ. 1422 (WFK) (RER), 2021 WL 7186030, at *11 (E.D.N.Y. Apr. 30, 2021) (declining to dismiss an allegation under Section 1594 on summary judgment because the "evidence must allow the jury to infer that the conspirators entered into a joint enterprise and were aware of its general nature and extent").

31

### c.    Plaintiff Has Sufficiently Pleaded Facts Within the Statute of Limitations Period

Since Plaintiff has plausibly stated violations of the TVPRA, the Court next addresses whether Plaintiff's claims are barred by the TVPRA's ten-year statute of limitations.  *See* 18 U.S.C. § 1595(c)(1) (stating that a TVPRA claim must be brought by a victim "not later than … 10 years after the cause of action arose").  Under the TVPRA, "[a] claim accrues 'when the plaintiff has a complete and present cause of action."  *Levin* v. *Sarah Lawrence College*, 747 F. Supp. 3d 645, 670 (S.D.N.Y. 2024) (quoting *Gabelli* v. *S.E.C.*, 568 U.S. 442, 448 (2013)).  Moreover, courts have held that TVPRA claims involve "a continuing tort, [so] a single act occurring within the limitations period will preserve a claim based on all acts that were part of a single pattern."  *Bensky* v. *Indyke*, 743 F. Supp. 3d 586, 602 (S.D.N.Y. 2024) (quoting *Schneider* v. *OSG, LLC*, No. 22 Civ. 7686 (AMD) (VMS), 2024 WL 1308690, at *5 (E.D.N.Y. Mar. 27, 2024)); *see generally Mix* v. *Del. & Hudson Ry. Co.*, 345 F.3d 82, 88 (2d Cir. 2003) ("[T]he continuing tort doctrine ... provides that, in certain tort cases involving continuous or repeated injuries, the statute of limitations accrues upon the date of the last injury and that the plaintiff may recover for the entire period of the [defendant's] negligence, provided that an act contributing to the claim occurs within the filing period."), *cited in Falso* v. *Town of Dansville Police Dep't*, 616 F. App'x 11, 12 (2d Cir. 2015) (summary order).  Since Plaintiff filed her initial complaint in this case on October 18, 2023, the parties agree that the statute of limitations period that applies to her TVPRA claims extends back to October 18, 2013.  (*See* Dkt. #1).

Shapiro maintains that this case should be dismissed on statute of limitations grounds because its core allegations indisputably occurred prior to October 18, 2013. (Def. Br. 23). His assertion is true — in part. Plaintiff's visa application was prepared in March 2013 (*see* AC ¶ 36; *see also* Feigenbaum Decl., Ex. G at 7 (showing that application was signed March 22, 2013); *id.*, Ex. J at 2 (dated March 28, 2013)), and Shapiro signed the Consulting Agreement with MPC on or about April 1, 2013 (Feigenbaum Decl., Ex. F at 4). However, Shapiro's argument fails at this stage of the litigation because the terms of the Consulting Agreement suggest that Shapiro continued to "receive [a] benefit" from the scheme within the limitations period. *See Levin*, 747 F. Supp. 3d at 671; 18 U.S.C. § 1595(a). To review, the Consulting Agreement recites that MPC will retain Shapiro's company ERG "on a monthly basis and retainer fee of $7,500 per month." (Feigenbaum Decl., Ex. F at 3). This contract with MPC, which the Amended Complaint alleges was controlled by Victor, then continued into 2018. (AC ¶¶ 61, 63). Drawing all inferences in Plaintiff's favor, the Court finds it plausible that Victor continued to provide a monthly benefit to Shapiro through the Consulting Agreement, at least in part because of Shapiro's participation in the labor-trafficking scheme.

In resolving this issue, the Court is particularly persuaded by the analysis in *Levin* v. *Sarah Lawrence College*, where Judge Liman rejected the plaintiff's argument that the statute of limitations for the TVPRA "does not begin to run until the victim escapes from the grasp of their traffickers." 747 F. Supp. 3d at 671. In so ruling, Judge Liman noted that there is no basis to

"conclude that [a] victim's escape from the primary trafficker controls accrual of claims against defendants who did not continue to traffic the plaintiff *or benefit from the plaintiff's continued trafficking.*"  *Id.* (emphasis added).  This conclusion makes logical sense, because the *Levin* plaintiff's proffered approach would have extraordinary reach, such that "[a] hotel that profited at one early time from a TVPRA violation occurring within its walls would continue to be subject to suit until ten years after the victim ceased being trafficked through other unrelated locales — even if the hotel long ago ceased to provide any support to the trafficking *or ceased to receive any benefit.*"  *Id.* (emphasis added).  However, what distinguishes this case from *Levin* is that the terms of the Consulting Agreement provided for non-automatic monthly renewals, and there is therefore a basis to conclude that Shapiro benefited from the trafficking within the limitations period as the Consulting Agreement continued to be renewed and the fees to him (through ERG) continued to be paid.

In sum, because the Court finds that Plaintiff has sufficiently stated TVPRA claims within the statutory period, the Court allows those claims to proceed, and does not reach the issue of whether the continuing violation doctrine would apply in this circumstance.[7]

---

[7]    In reaching this conclusion, the Court notes that Shapiro did not ask this Court to draw any unreasonable inferences from the documents he submitted in support of his motion.  That said, many of Shapiro's arguments relied, at least in part, on materials that this Court cannot consider at this time.  Such arguments will be better addressed (and may very well succeed) at the summary judgment phase.

### 3.    Victor Is Not a Necessary Party to This Action

Finally, Shapiro argues that if the Amended Complaint is not dismissed, Victor should be added as a necessary party under Rule 19(a) of the Federal Rules of Civil Procedure.  Since Plaintiff's claims remain, the Court addresses Shapiro's arguments under Rule 19(a), which instructs that an absent party must be joined, if feasible, where:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).

Victor is not a necessary party within the meaning of Rule 19(a).  *First*, under Rule 19(a)(1)(A), Victor's absence "will not prevent the district court from granting complete relief" among the existing parties.  *MasterCard Int'l Inc.* v. *Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 385 (2d Cir. 2006) ("A party is necessary under Rule 19(a)(1) only if in that party's absence 'complete relief cannot be accorded *among those already parties.*'" (emphasis in original) (quoting Fed. R. Civ. P. 19(a)(1)).  This is because the TVPRA contains specific provisions for participant liability, which do not require joinder of the primary trafficker to proceed.  *See, e.g.*, *W.K.* v. *Red Roof Inns, Inc.*, 692 F. Supp. 3d 1366, 1379 (N.D. Ga. 2023) ("[T]here is no statutory or rule-based requirement that a TVPRA plaintiff join or attempt to join the trafficker in a civil action.");

*see also Doe (H.E.W.)* v. *Radisson Hospitality, Inc.*, No. 23 Civ. 1456 (DII) (ML), 2025 WL 349556, at *12 (W.D. Tex. Jan. 21, 2025) (declining to deem a party necessary under Rule 19 because the court could "accord complete relief among existing parties" and noting that courts frequently allow complaints to move ahead when "hotel franchisors and franchisees [and not the primary trafficker] are the sole defendants"), *report and recommendation adopted*, No. 23 Civ. 1456 (DII), 2025 WL 560708 (W.D. Tex. Feb. 19, 2025).  As such, Plaintiff's claims can be resolved without Victor's participation.

*Second*, under Rule 19(a)(1)(B), Shapiro's cannot assert that Victor's interest would be harmed if Victor is not deemed a necessary party.  (Def. Br. 25).  Courts in this District have consistently found that a party named in the litigation cannot assert interests on an absent party's behalf.  *See, e.g.*, *Cont'l Cas. Co.* v. *Am. Home Assur. Co.*, No. 05 Civ. 7874 (LTS), 2008 WL 1752231, at *4 (S.D.N.Y. Apr. 14, 2008) ("[T]he absent party must be the one claiming the interest.  A party named in the litigation cannot assert the interest on the absent party's behalf." (internal citation omitted)); *see also Aguinaga* v. *UBS AG*, No. 09 Civ. 3261 (RJH), 2010 WL 5093433, at *10 (S.D.N.Y. Dec. 14, 2010) (collecting cases).  Moreover, even if Shapiro could assert Victor's interests, Victor's absence does not pose a risk; in point of fact, Victor does not have an interest that will be impaired precisely because of his absence from this litigation.  *See MasterCard*, 471 F.3d at 386-87 ("It is not enough under Rule 19(a)[(1)(B)] for a third party to have an interest, even a very strong interest, in the litigation.  Nor is it enough for a third party to be adversely

36

affected by the outcome of the litigation.  Rather, necessary parties under Rule 19(a)[(1)(B)] are only those parties whose ability to protect their interests would be impaired because of that party's absence from the litigation.").  And "[i]nconsistent obligations [only] occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident."  *Fed. Ins. Co.* v. *SafeNet, Inc.*, 758 F. Supp. 2d 251, 258 (S.D.N.Y. 2010).  The allegations here focus exclusively on Shapiro and Kaye's potential liability, and do not risk imposing obligations on Victor that would conflict with those in the Victor Litigation.  Accordingly, while the Court acknowledges that most of the factual allegations in the Amended Complaint relate to Victor — an issue that might prove critical at the summary judgment phase of this case — the Court finds that Victor is not a required party under Rule 19(a).

## CONCLUSION

As is clear from the foregoing decision, the Court has been largely constrained by the procedural posture of the case and the limitations on the documents that it may properly consider.  Given those limitations, Shapiro's motion to dismiss the Amended Complaint is hereby DENIED in full.  The Clerk of Court is directed to terminate the pending motion at docket entry 26.  The parties are hereby ORDERED to meet and confer and submit a case management plan on or before **April 7, 2025**.  In addition, Plaintiff is directed to submit a letter to the Court, on or before **April 11, 2025**, advising the Court of her intentions with respect to Defendant Kaye.

SO ORDERED.

Dated:      March 17, 2025
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge